**Bruce Douglas WILLARD, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 6285.**

Court of Appeals of Alaska.

April 29, 1983.

Christine Schleuss, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for appellant.

Elizabeth H. Sheley, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Bruce Douglas Willard was convicted by jury trial of sexual assault in the first degree, AS 11.41.410(a)(1), and sentenced by Superior Court Judge J. Justin Ripley to eight years' incarceration. Willard appeals the conviction and sentence; we affirm.

Because Willard makes several arguments that turn on the degree of his participation in the assault, we must examine the trial testimony in some detail.

Willard and two other boys, all recently having graduated or left high school, were driving around the Homer area in Willard's truck at about 11:00 p.m. on the night of September 8, 1980. A former classmate, D.C., was walking up the highway after completing her shift at a local cannery. Willard's truck drove past her several times. At some point one of the boys, William Marinelli, "mooned" D.C. from the back of Willard's truck. At other points, sexual comments were yelled at her.

D.C. eventually turned onto a gravel road leading over West Hill, a rural area. After passing her again, Willard, Marinelli, and Robert Fell, the third boy, decided to scare or "harass" her. They parked the truck and walked up the hill behind D.C. with their hoods or shirts pulled up over their faces. When they got near her, Willard ran across the road and grabbed D.C.; the others were apparently close behind. D.C. ended up on her back in a ditch by the road, with Willard lying across her shoulders or chest and Marinelli and Fell apparently holding her legs.

The testimony concerning events occurring after this point diverged sharply. D.C. testified that she first walked past the pickup truck when it was parked in the high school parking lot, that she heard three voices yelling at this time, and that she recognized one voice to be that of Fell, whom she knew. On the occasions when the truck was passing her, she was unable

to see anyone or to tell who was yelling. It was very dark on West Hill Road. D.C. heard only footsteps before she was pushed into the ditch and pinned to the ground. The person lying across D.C.'s chest placed some sort of cloth over her nose and mouth. D.C. repeatedly screamed and tried to indicate that she could not breathe. By this time, two pairs of hands had pulled her pants and panties down below her knees, and D.C. felt fingers being placed in her vagina. Soon thereafter; according to D.C.:

> I started kicking a lot and then the other two got up and stood away and then zipped—or unzipped and other—someone else was starting to urinate on my leg.
>
> [Prosecutor]: Do you actually know that or was that an impression that you had at that time?
>
> A: Well, something was coming out of this person's penis on my leg.
>
> Q: Now, did—was there any intercourse that took place at that time?
>
> A: Shortly after.
>
> Q: And are you—do you know that that was a penis that was stuck in you at that time?
>
> A: Yes, sir.

When asked if the person lying across her chest stayed there during the entire episode, D.C. repeatedly stated that she did not know.[1]

During the intercourse D.C. was struck twice in the face; she continued to scream, and someone said, "shut up, bitch—I let you breathe," and later, "we know what you want, give it to us." D.C. could not recall the period immediately after the intercourse very well, and she was unsure of the duration of the assault. However, when she realized she was alone, she pulled her pants up, rose to her feet, and walked over to the road. There was apparently no period within her memory during which only one person was with her; she seemed to recall two boys running away together after the intercourse. The findings of a doc-tor who examined D.C. shortly after the assault were consistent with D.C.'s version of events, including the forced penetration.

William Marinelli testified that, while in the truck, "we said that we'd put our hoods up and change our voices—to scare her, you know." He was impeached with a statement he had made to police, that Willard stated "I'll hold her down"; Marinelli admitted Willard never said this. However, according to Marinelli, Willard was in front as they approached D.C., and he then "shot" across the road and "tackled" her. Marinelli could hear "wrestling around or movement" in the ditch before he and Fell reached her and began pulling her pants down. At some point, Marinelli and Fell both stood up and looked down at D.C. Willard, who was lying across D.C.'s chest, motioned Marinelli and Fell over to him, so Marinelli went over and took Willard's place, keeping one hand over D.C.'s mouth. Marinelli told police that Willard soon had his pants down, and that he said he wanted to "try." Marinelli assumed that Willard was positioned over D.C., because he could hear someone fumbling with her shirt.

After about thirty seconds, Marinelli got back up, walked over to the road and then toward the truck. After a minute or so, Willard came up behind him. They got in the truck, drove around a bend, and stopped to pick up Fell when they heard him whistle. Marinelli was unsure of Fell's whereabouts from the time that Willard motioned to them, but back in the truck Willard and Marinelli both teased Fell about "chickening out."

Marinelli and Fell were each convicted of first-degree sexual assault prior to Willard's trial; at Willard's trial, however, Marinelli repeatedly denied that he or Fell ever penetrated D.C.

The prosecution also presented a tape of a police interview with Willard. On the tape, Willard stated "I went across the road and we grabbed her.... I was holding her down and then she screamed and so I put,

---

1. D.C. continued to maintain that she did not know, even when confronted with her statement to police (made about four hours after the incident) that "he just stayed his body physically—his chest was over my abdomen and that is how he stayed throughout the whole thing."

my t-shirt on her mouth so she wouldn't scream real loud." He also stated that he heard Marinelli hit D.C. twice, and that someone down by her legs was "trying to." On the tape, Willard stated that it was Fell's idea to wait until D.C. got up the hill, and that in general "Bobby [Fell] was the one going wild." When asked by the police officer, "Well, are you stating to me then that Bobby was the instigator of most of this stuff verbally?," Willard answered in the affirmative.

Willard's testimony on his own behalf was generally consistent with the tape. According to Willard, the "mooning" was Fell's idea, but Marinelli did it. Before they parked the truck, they agreed to hold D.C. in the ditch for a couple of minutes. Willard admitted being the first one to contact D.C. as they went across the road, but stated that Fell and Marinelli helped carry her into the ditch, until they put her feet down and she stumbled or tripped as Willard was setting her down. He lay across her chest and held her wrists for a short time; when he turned and saw that her pants were down, he got scared, jumped up and ran away. Before leaving, however, he saw that Marinelli was standing by her side, and assumed that Fell was still at her feet. He heard the slapping or hitting sound and the statement "shut up, bitch" as he was moving away. When he got near the truck he stopped to listen, and Marinelli came up the road. Willard testified that he was with D.C. for five minutes or less.

The main difference between Willard's trial testimony and the police tape involved his awareness of what Marinelli and Fell were doing. At trial, he denied that he knew they were trying to have sex with D.C., despite the statement on the tape to the contrary and the fact that his head was less than two-and-a-half feet from her pelvic area as he held her. He continued to

deny that he was ever down by her feet or that he ever penetrated her.

Blood samples were taken from Fell, Marinelli, and Willard and mailed to an FBI laboratory along with the pants and panties D.C. was wearing during the assault. The FBI technician who received and examined this evidence, Dr. Beams, testified as to his findings. These findings supported the conclusion that it was Willard who ejaculated in the area of D.C.'s crotch.[2]

█ Willard's first contention on appeal is that there was an insufficient foundation for Dr. Beam's testimony as to his findings, and in particular that the results of the blood tests should not have been admitted at trial because the blood samples were not properly authenticated.

Early in his testimony, Dr. Beams described the FBI procedures for the handling and testing of blood samples. One number is assigned to each vial throughout the entire process, and the slides are marked with the number of the vial from which the blood placed thereon was taken. While he had no present recollection of testing the samples in this case, he testified on *voir dire* by defense counsel that either he or his assistant did so; he also testified that his assistant did not do any work on specific cases outside his direct supervision, meaning within four or five feet of him and acting at his direction. Willard's counsel challenged introduction of the results of the blood tests on a foundational basis, but Judge Ripley denied the motion, stating that the use of an assistant posed no problem because, under the circumstances, "it is as though that person were operating as an additional hand."

Judge Ripley's conclusion is essentially correct. It is true that Evidence Rule 901(a) imposes a strict standard on the trial court for admitting such evidence in a crim-

---

**2.** Dr. Beams testified that Fell's blood proved to be from group O, that Marinelli's was type A, and that Willard's was type B. He also testified that material taken from D.C.'s trousers and panties proved to contain two enzymes, in concentrations only present together in semen, although no sperm were detected. Finally,

Beams explained that the tests revealed that Willard was a "secretor," an individual who has his blood group substance present in his other bodily fluids, and that the semen on D.C.'s trousers and panties contained blood group B substances. Only ten percent of the population have group B blood.

inal proceeding. The burden was on the prosecution to "demonstrate as a matter of reasonable certainty that the evidence is at the time of trial or was at the time it was observed properly identified and free of . . . possible taints," including "adulteration, contamination, modification, tampering, or other changes in form attributable to accident, carelessness, error or fraud." A.R.E. 901(a). Yet, even under the rule, "every conceivable possibility of tampering need not be eliminated." *Wright v. State,* 501 P.2d 1360, 1372 (Alaska 1972). *See also* commentary to Alaska Rule of Evidence 901(a) at 268–69 (*Wright* and other cases "illustrate that Rule 901(a) does not hold the government to an onerous standard of proof, but merely to the same reasonable requirement that it is used to fulfilling").

Upon review of Dr. Beams' testimony, it cannot be said that Judge Ripley abused his discretion in allowing the evidence. Beams' procedural description was so complete as to cure any problem arising from the fact that he could not recall whether he had personally performed the tests.[3]

Willard also contends that Judge Ripley improperly relied upon unproven allegations in deciding on the sentence to be imposed. He argues that this court should adopt a formal standard of proof for any material to be relied upon at sentencing, and that the standard required for aggravating and mitigating factors under Alaska's presumptive sentencing scheme—clear and convincing evidence (AS 12.55.155(f))—would be appropriate. Because we find the allegations relied upon by Judge Ripley to have been supported even under a "clear and convincing evidence" standard, we need not decide whether a formal standard of proof

is necessary for first offender sentencing or whether the standard proposed by Willard is appropriate.

As we stated in *Huckaby v. State,* 632 P.2d 975, 976 n. 2 (Alaska App.1981), "[t]he supreme court has never articulated a burden of proof at sentencing proceedings and it may be that there is no burden of proof." In *Nukapigak v. State,* 562 P.2d 697 (Alaska 1977), *aff'd on rehearing,* 576 P.2d 982 (Alaska 1978), the Alaska Supreme Court stated that allegations of misconduct must be "corroborated or substantiated by supporting data or information" in order to be considered at sentencing. 562 P.2d at 701 & n. 2. The opinion on rehearing in *Nukapigak* implies that a "mere claim of invalidity" on the part of the defendant is insufficient to trigger a full inquiry by the sentencing court, but notes that "the result in this case could have been otherwise had there been a proper attack on the accuracy of the presentence report." 576 P.2d at 984. Chief Justice Boochever, joined by Justice Rabinowitz, took issue with this statement in the two-justice plurality opinion, and wrote in concurrence:

> The [plurality] opinion does not make clear as to what a defendant must do to respond to hearsay allegations. I do not think that it is proper to require a defendant to prove the negative of such allegations. It seems to me that the appropriate procedure would be for a defendant to deny either orally or in writing allegations in a pre-sentence report which he believes to be untrue. A hearing would then be required at which time the state should present evidence of the disputed allegations. The defendant

---

3. It is also important to note the limited nature of the possible error in this case. Willard does not suggest that blood was never drawn from the three boys, or that this blood was not tested by the FBI; his particular concern was that the three vials might have been confused with one another. Yet the tests served merely to establish the blood type of each individual, something which could be tested repeatedly, or possibly established by existing medical records. Willard does not suggest that any of the boys, including himself, had a blood type different from that assigned to them by Dr. Beams.

The commentary to Evidence Rule 901 makes it clear that the stringency of the foundational requirement is to be increased when the challenged evidence is important to the prosecution's case. Commentary to A.R.E. 901(a) at 268. While the evidence indicating that Willard's semen was on D.C.'s clothes was important to the state's case, the nature of Willard's precise complaint and the ease with which he could have rebutted Dr. Beams' findings if they had been incorrect militates against finding an abuse of discretion.

would also have the opportunity of presenting witnesses of his own and of testifying.

*Id.* at 985 (Boochever, C.J., concurring).

█ It is clear that Judge Ripley was well aware of the concerns expressed in the two *Nukapigak* cases. Willard's presentence report included discussion of four instances of alleged sexual misconduct separate from the assault on D.C., based on police reports as well as interviews of the victims and of Willard. At the sentencing hearing, Judge Ripley immediately asked about the status of these allegations. Defense counsel discussed his understanding of *Nukapigak* and then stated that he was "specifically challeng[ing]" one of the sexual conduct allegations. Defense counsel also stated that,

> as to the other collateral contacts presented in the presentence report, we've advised the state and specifically advise the court right now that we will be satisfied with the court resolving them in essence on the briefs. There is a written statement by each collateral contact.

There's written response by my client and we'd be satisfied to have the court consider it that way . . . .

The prosecutor reported that the victim of the alleged assault specifically challenged by Willard was out of the state, and that his reading of *Nukapigak* was that in this situation it was incumbent upon the state to present sworn testimony. He also stated that, as to the other incidents,

> during today's proceeding, it's—counsel is correct that we will be proceeding as if they—as if each side was swearing to that as testimony so it could be considered by the court and the weight it— the court desire it to be given.

Judge Ripley responded by discussing his own understanding of *Nukapigak*.[4] The "unverified" incident was subsequently deleted from the presentence report, and there is no indication the court considered it when fashioning a sentence. It is clear that Judge Ripley considered the other three incidents, however;[5] he later referred to them as "incidents which I have considered by stipulation of counsel."[6]

4. Judge Ripley's remarks included the following:

> It seems to me the majority is saying if the defendant wishes to contest it he must do so in a meaningful fashion . . . . Obviously . . . the government can't hide the witness and then use a hearsay statement. There's no suggestion of that here. . . . [W]here as here the hearsay information was obtained from the best possible source, first-hand interview with the alleged victim, it strikes me that the majority would allow that, *given the defendant's opportunity, if he wished to do so, to contest it in some fashion.*

(Emphasis added.)

5. Information concerning the three incidents of sexual assault that were not deleted from the presentence report may be summarized as follows:

(1) D.T. accepted a ride from Willard in April. He drove to a remote area under a pretext; he pulled out her shirt and tried to unbutton and remove her skirt. She successfully resisted, and Willard eventually drove her home. D.T. substantiated the report in a telephone interview with the probation officer, and added that as far as she was concerned, he was trying to rape her.

(2) Also in April, Willard followed E.G. from school and pulled his truck in front of her car to get her to stop. He got into her car and took

the keys from her; she got out, but Willard followed her in his truck, and finally pulled her into the front seat. Willard eventually coerced E.G. into masturbating him by threatening to rape her, then drove her back to her car. E.G. also substantiated this report, and stated that she felt Willard was "sick."

(3) On June 9, 1979, Willard drove D.M. to an isolated area and attempted to "make out." D.M. resisted, and bit Willard on the left side of the face. Willard then struck D.M. in the face; she got out, and Willard threw her on the ground, struck her again, and kicked her. Willard eventually convinced D.M. to re-enter the truck. After making further unsuccessful sexual advances, Willard drove her home. Like the other incidents reported, this one was substantiated in an interview with the victim.

In his own interview with the probation officer, Willard essentially denied any assaultive conduct on his part, and attempted to explain the allegations, stating, "I guess I was just going with too many girls at one time in a small town."

6. Alaska R.Crim.P. 32(c)(2) provides that the presentence report should contain any prior conviction, but that "no record of arrest or other police contacts shall be included in the report." *Adams v. State,* 521 P.2d 516, 519 (Alaska 1974), suggests that the real concern

Willard argues by implication that it was incumbent upon Judge Ripley to make a finding as to whether each incident occurred. Under the circumstances of this case, we do not agree. The facts contained in the presentence report would be sufficient to support a finding, by clear and convincing evidence, as to each incident. In each case, the truth of the police report was substantiated by a telephone interview with the victim, and the police reports themselves were based on information directly obtained from each victim.

More importantly, we note that Willard indicated no real desire to challenge the reports. The fact that Willard's counsel formally challenged a fourth alleged incident of sexually assaultive behavior as well as an earlier incident involving a firearm [7] suggests a belief on his part that a formal challenge would entitle his client to a hearing, including the right to present testimony. No such hearing was requested. Indeed, by expressly agreeing to submit these matters "on the briefs," *i.e.,* on the statements contained in the presentence report, Willard apparently intended to leave the sentencing court free to examine this evidence and to give it whatever weight might be deemed appropriate.

■ Willard relies heavily on authority documenting the need for formal standards of proof at sentencing.[8] We recognize that these arguments are not insubstantial. However, there are countervailing factors militating against the injection of unnecessary formalism into proceedings whose fundamental purpose is to shed light on the character of the offender.

> Highly relevant—if not essential—to [a trial judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to [a] trial.

*Williams v. New York,* 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337, 1342 (1968), *quoted in Elson v. State,* 659 P.2d 1195, at 1202 (Alaska, 1983).[9] Given the circum-

here is with police contacts which are given little detail and left unexplained throughout the sentencing proceedings. *See also Whitton v. State,* 533 P.2d 266, 269 (Alaska 1975). Police took no further steps with regard to these incidents, and this was made clear to Judge Ripley.

7. *See infra* note 11.

8. *See* Note, *A Hidden Issue of Sentencing: Burdens of Proof for Disputed Allegations in Presentence Reports,* 66 Geo.L.J. 1515 (1978). The note examines the historical development of due process rights at sentencing, the crucial role of the presentence report, and the variety of approaches taken by courts to the problem of disputed allegations contained in the report. *Id.* at 1528–48. *Compare United States v. Weston,* 448 F.2d 626, 634 (9th Cir.1971) (to place burden on defendant to prove the negative of a government allegation would be a "miscarriage of justice"), *cert. denied,* 404 U.S. 1061, 92 S.Ct. 748, 30 L.Ed.2d 749 (1972) *with United States v. Battaglia,* 478 F.2d 854 (5th Cir.1972) (defendant entitled only to a hearing "at which he may seek to remove any lingering doubt") *and United States v. Espinoza,* 481 F.2d 553 (5th Cir.1973) (defendant should have had "an opportunity to rebut" information explicitly relied upon by sentencing court). *See also Unit-*

*ed States v. Needles,* 472 F.2d 652, 658 (2d Cir.1973), where the court stated that "in some circumstances the probation office or prosecution should be requested to provide substantiation of challenged information submitted to the judge" and, similarly, "in appropriate instances the defendant ought to be allowed to present evidence," but that in other situations, burdens of proof and procedures regarding disputed information should be left to the sentencing judge's discretion. For the view that many courts have failed to implement the policy of ensuring reliability of presentence information expressed in Fed.R.Crim.P. 32(c)(3), *see* Fennel & Hall, *Due Process at Sentencing: An Empirical and Legal Analysis of the Disclosure of Presentence Reports in Federal Courts,* 93 Harv.L.Rev. 1613 (1980).

9. Willard's argument analogizing presentence allegations to the aggravating and mitigating factors set forth in AS 12.55.155 is of limited utility. Alaska's presumptive sentencing scheme requires a finding by the sentencing court as to each factor alleged because it is only where such factors are present that the court can deviate from the presumptive term. *See* AS 12.55.155(f). Findings as to aggravating or mitigating factors constitute findings as

stances of this case, however, we need not decide whether the clear and convincing evidence standard should have been applied to the evidence of Willard's prior acts. We think that, by expressly agreeing to consideration by the sentencing court of the information in the presentence report concerning his prior misconduct, Willard waived his right to argue on appeal that this information could not be relied upon by Judge Ripley without an express finding, by clear and convincing evidence, that the alleged incidents did occur.

■ Willard also contends that Judge Ripley improperly relied upon two specific findings: that Willard acted as a leader in the assault and that he lacked remorse. We hold that the findings of the court, as fashioned, were supported by clear and convincing evidence. Furthermore, we think the record makes it clear that Judge Ripley considered these facts to be clearly and convincingly established.

Judge Ripley, in imposing sentence, remarked:

> I find from an evaluation of the evidence at trial that the defendant did exercise a leadership role. Certainly, it was in the nature of a joint venture and there is no doubt but that suggestions were made by others, but from my analysis of the evidence a significant leadership role was exercised by the defendant.

From his questions to counsel and other remarks at the sentencing hearing, it is clear that Judge Ripley based the finding in large part on the physical evidence showing that it was Willard who penetrated D.C. Willard argues on appeal:

> The fact that the evidence of blood type indicated Willard sexually penetrated her does not make him the leader of the others. Alaska has abolished the distinctions between accomplices and principals.

to ultimate facts, which will normally be relied upon by the court to adjust a presumptive term. Where, as here, the court is presented with information that might not directly be used to aggravate a sentence but might instead be relied upon, together with other information, for the purpose of making basic findings as to

The prosecutor happened to make a similar remark during the sentencing hearing, and Judge Ripley responded that this was true as a matter of law, but that "at sentencing who assumes the leadership role is a matter of significance to my mind."

■ We agree with Judge Ripley. A sentencing judge must be concerned with implications arising out of the trial testimony which go beyond the purely legal. Consideration of underlying facts developed at trial is essential to formulation of an appropriate sentence. *See Huckaby v. State,* 632 P.2d 975, 977 n. 2 (Alaska App.1981). Judge Ripley had the advantage of hearing the detailed testimony of several witnesses concerning this offense. The finding of a leadership role arose directly from the testimony of these witnesses. Moreover, the finding was not dependent solely on the evidence of penetration: it was Willard's truck and he was driving; also, Willard reached D.C. first and pinned her to the ground in the ditch. It is also important to note that Judge Ripley did not find that Willard planned the entire episode, or that Marinelli and Fell were under Willard's direction, but only that Willard exercised certain elements of a leadership role. This is a limited finding that is clearly supported by the record as a whole, and that does not appear to have been given disproportionate weight at sentencing.

Willard's argument regarding remorse involves slightly different issues. In a statement incorporated in the presentence report, Willard first recounts a version of the offense that parallels his trial testimony and clearly denies penetration or knowledge of penetration. He then states the following:

> I cannot answer why I did it because I am not guilty of the crime I was convicted of.

the defendant's character, such as his need for and amenability to rehabilitation, then the problem of how far the court must go in making clear its findings as to preliminary factual matters, as well as the standard to be applied to such preliminary findings, becomes substantially more troublesome.

For the part I did I am very sorry. It makes me sick to my stomach to think I was even partly involved in anything like that. I am sorry that I messed up my life.

That I caused the courts all this trouble. I am very sorry that I was even a small part of making her feel the way I saw her that day in the court room. I realize what she must be going through and I wish there was something I could do to help her.

At the hearing, Judge Ripley asked:

Isn't there an absence of significant remorse demonstrated in the statements of the defendant in that ... [he] denies guilt, not uncommon for persons convicted of crime, I'll grant you that and you don't give extra time for failure to confess a past conviction, but it also takes from the court the—well, the hopeful sound of early rehabilitation. It may be wilfulness, it may be malicious, it may simply be an inability to face and all those, given this offense, are probably almost equally as dangerous. Where he does say he's sorry, he's talking about messing up his life. Now, again, that may simply be post-teenage selfishness that he hasn't grown out of, [and] he does have other hopeful things to say about himself in there ... but ... this failure to express remorse goes back to the thing that I've raised ... twice before and that is unless you have some suggestion to the contrary to make to me here, the act of sexual intercourse had to have been accomplished by him. Nobody else.

The more remorseful portion of Willard's statement was pointed out to the court, and Judge Ripley indicated that this was what he was referring to when he mentioned "other hopeful things" and "a positive tone overall." Defense counsel sought to distinguish clear situations of perjury on the stand from situations in which the court improperly chooses to look beyond the verdict to some other offense. Judge Ripley recognized the distinction, but also discussed

[what is] cynically referred to as the defendant's constitutional right to weasel under oath .... Like I say, it is not the kind of thing you penalize a person for, but when you start talking to me about ... rehabilitative potential, lack of danger, I have to look at this fellow and become very concerned about the problem that he apparently at this point cannot deal with.

At allocution, Willard made a short statement which included the remark that he was "very sorry for [his] part in this crime." In imposing sentence, Judge Ripley did mention the lack of remorse.

Willard argues that cases such as *Christian v. State,* 513 P.2d 664 (Alaska 1973), prohibit consideration of denial of guilt at sentencing. However, when taken as a whole the record is clear that Judge Ripley's real concern was with rehabilitative potential and in particular the lack of insight indicated by some of Willard's statements as well as the psychologist's report. Moreover, Judge Ripley had an opportunity to observe Willard throughout the trial and sentencing, and he was not obligated to accept all of Willard's statements as true.[10] Finally, in light of the other factors discussed at sentencing, it cannot be said that undue weight was placed on the lack of remorse.

■ Willard also contends that his sentence was excessive. The eight-year sentence with no time suspended exceeds both the then applicable six-year term and the present seven-year term for first offenders who used or possessed a firearm or caused serious physical injury in the course of committing a class A felony. Former AS 12.-55.125(c)(1); AS 12.55.125(c)(2). A judge sentencing a first offender convicted of a class A felony may impose a sentence of up

---

10. We think that the manner in which Judge Ripley considered Willard's lack of remorse is analogous to cases in which sentencing judges have been allowed to take into account their belief that the defendant committed perjury at trial, to the extent that the perjured testimony was directly relevant to the issue of the defendant's rehabilitation. *Campbell v. State,* 594 P.2d 65, 67–68 (Alaska 1979); *Fox v. State,* 569 P.2d 1335, 1338 (Alaska 1977).

to the presumptive term of seven (formerly six) years based solely on an analysis of the *Chaney* factors. *State v. Chaney,* 477 P.2d 441 (Alaska 1970). However, under this sentencing structure, a first offender normally should not be sentenced to a term greater than the presumptive sentence unless the trial judge finds that there are sufficiently verified facts concerning the offender or the offense that make the offense more serious than one in which either a firearm is possessed or the victim suffers serious physical injury. The circumstances that would justify an enhanced sentence should either be aggravating factors set out under AS 12.55.155(c), or else extraordinary circumstances which would justify referral to a three-judge panel if presumptive sentencing were applicable. AS 12.55.165.

■ This test is met in Willard's case since we believe it involved extraordinary circumstances. Certainly the three prior sexual incidents, although they were not in a linear progression of seriousness, could properly be considered very significant by the court.[11] *Davis v. State,* 635 P.2d 481, 487 (Alaska App.1981). *See also* AS 12.55.-155(c)(8). The manner in which the offense was committed, at a time and in a place where D.C. would be particularly vulnerable, and with some attempt at disguise, as well as the fact that D.C. was left in the ditch, must also be taken into account.

The record also discloses that Judge Ripley was also properly concerned with the rehabilitative potential of the offender himself. Willard's relative inability to relate to girls was documented in the presentence report. The presentence report also stated that the head of the youth center "depicted [Willard] as a very troubled youth who refused to accept responsibility for his behavior, had a 'hot temper,' was 'hard-nosed' and

'physical'," and the testimony of the other director there was in accord. The probation officer himself recommended a "substantial period of time to serve," noting that:

> Isolation of the defendant from society is needed to aid in his receiving treatment, to protect society and to give him a firm message that his means of obtaining sexual gratification will not be tolerated by the community.

Recognizing Willard's substantial, albeit not severe, psychological problems, Judge Ripley strongly recommended that psychiatric evaluation and counselling be made available during incarceration, and that the parole board consider these psychiatric reports to determine Willard's "insight into his emotional problems" before granting parole. However, Judge Ripley noted that one psychiatrist who had already tested Willard suggested that little insight would be gained from counselling at this time. This conformed to the impression of Willard that Judge Ripley had formed during trial, and led him to conclude that "if no insight can be gained by counselling, then the only way that society can protect itself from Mr. Willard is to make his memory of the next few years so painful that he would under no circumstances allow himself to engage in this kind of conduct."

Finally, we note that the record would support a finding that Willard "was the leader of a group of three or more persons who participated in the offense," AS 12.55.-155(c)(3). In light of all the circumstances, we hold that the eight-year sentence was not clearly mistaken. *McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974).[12]

Willard's conviction and sentence are AFFIRMED.

**11.** In addition, Judge Ripley heard testimony from witnesses about two other events. Willard apparently went AWOL for several days from a youth center at which he had been placed. After he was found and brought back, the story was circulated that he "would have shot the counselor [who apprehended him] if [his] gun hadn't jammed." When asked by the director of the center if this was true, Willard replied "yes," and smiled. The other incident

involved testimony from two juvenile witnesses that Willard gave them cocaine at a party while he was out on bail.

**12.** We note also that Willard's sentence equals the presumptive term currently in effect for first offenders who commit the now unclassified offense of first-degree sexual assault. AS 11.41.410(b).