Tyoga G. CLOSSON, Appellant,

v.

STATE of Alaska, Appellee.

Nos. A–1589, A–2019.

Court of Appeals of Alaska.

Dec. 22, 1989.

Rex Lamont Butler, Anchorage, for appellant.

* Sitting by assignment made pursuant to article

Robert D. Bacon, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and CUTLER, Superior Court Judge.*

## OPINION

BRYNER, Chief Judge.

Tyoga G. Closson was convicted by a jury of theft in the second degree. He was thereafter charged with two counts of perjury for testimony he had given in connection with his theft case. Closson pled no contest to one count and was convicted of the other. In case No. A–1589, Closson appeals his theft conviction. In case No. A–2019, Closson appeals the perjury conviction that resulted from his trial. We affirm in both cases.

### THEFT—CASE NO. A–1589

#### I. Facts

In October 1985, Closson stole a .45 caliber pistol from an Anchorage home where his girlfriend was housesitting. Closson told a friend, Robert Betts, about the gun. Betts introduced Closson to John Bright, who paid $75 to borrow the gun. On October 12, 1985, Bright used the gun to shoot and kill Robert Pfeil. Betts drove the car from which Bright fired the shots. Two days later, Betts returned the gun to Closson and told him to get rid of it.

On October 24, Investigator Ken Spadafora of the Anchorage Police Department heard that Closson had been telling people he was involved in the Pfeil shooting. In response to a request by Spadafora, Closson came to the police station. There he told Spadafora and Police Sergeant Michael Grimes about stealing the pistol and lending it to Bright. Closson informed the officers that he threw the gun into the inlet several days after Betts returned it.

Later that same day, Closson spoke with Assistant District Attorney Stephen Branchflower and entered into an agree-

IV, section 16 of the Alaska Constitution.

ment to assist the police. In exchange for Branchflower's promise to dismiss a pending misdemeanor assault charge and to immunize Closson from prosecution for theft of the pistol, Closson agreed to wear a transmitter and engage in surreptitiously monitored conversations with Betts, Bright, and other suspects in the Pfeil shooting. Closson also agreed to testify truthfully when called upon in any future court proceeding relating to the shooting.

Upon concluding the immunity agreement, Closson appeared before a judge and testified in support of an application for a warrant authorizing electronic monitoring of his anticipated conversations with Betts and Bright. Closson's testimony at the search warrant hearing was consistent with the statement that he had given to the police, including the claim that Closson had thrown the stolen pistol into the inlet.

On October 25, the day after the search warrant hearing, Closson admitted to the police that he had lied about throwing away the pistol. He disclosed that he had in fact traded it to a friend, Jack Peters, for some cocaine. Closson was immediately taken back before the judge who had presided over the previous day's search warrant hearing. Closson corrected the false testimony he had given the day before, and the court ratified the previously issued warrants.

Over the next three weeks, Closson made a number of surreptitiously monitored contacts with various individuals involved in Pfeil's murder. The investigation culminated on November 11, in the filing of an information charging Betts, Bright, and others with the shooting. The probable cause statement appended to the information disclosed Closson's identity as a police informant.

On November 14, the police contacted Closson and instructed him to report to the station to participate in another monitored conversation, this time with Jack Peters. The police also told Closson that he would be required to testify before the grand jury on November 18. Closson failed to appear at the station. Efforts to contact him prior to the grand jury hearing were unsuccessful, and Closson did not appear before the grand jury on the day of the hearing. At the conclusion of its November 18 hearing, the grand jury issued an indictment charging various individuals in connection with Pfeil's murder; the indictment included a count charging Closson with second-degree theft for stealing the pistol that was ultimately used as the murder weapon.

## II. Specific Enforcement of Immunity Agreement

Prior to trial, Closson moved to dismiss the theft charge, contending that he was entitled to specific performance of the state's promise not to prosecute. In response, the state argued that Closson had violated the terms of his immunity agreement by testifying falsely at the search warrant hearing of October 24, by failing to cooperate in efforts to monitor a conversation with Jack Peters on November 14, and by failing to appear to testify before the grand jury on November 18.

Closson countered the state's argument by claiming that the state, not he, had breached the immunity agreement. After conducting an evidentiary hearing to determine the scope and terms of the immunity agreement and the circumstances surrounding its breakdown, Superior Court Judge Mary E. Greene concluded that Closson had breached the immunity agreement and was not entitled to specific performance. Accordingly, Judge Greene denied Closson's motion to dismiss. On appeal, Closson claims that the court erred in declining to enforce the agreement.

■ We begin our analysis of Closson's argument by considering the ground rules governing enforcement of immunity agreements. Immunity agreements are contractual in nature and general principles of contract law apply to the resolution of disputes concerning their enforcement and breach. *See, e.g., United States v. Irvine,* 756 F.2d 708, 710–11 (9th Cir.1985). In such cases, "[t]he law of contracts presents an apt model to guide and inform ... analysis." *United States v. Carrillo,* 709 F.2d 35, 36 n. 1 (9th Cir.1983). *See also*

*United States v. Brown,* 801 F.2d 352, 354 (8th Cir.1986), and cases cited therein.

■ There is nevertheless widespread recognition that cases involving immunity agreements cannot always be decided by mechanical application of contract law. *Carrillo,* 709 F.2d at 36 n. 1. Although the analogy between immunity agreements and ordinary contracts is useful, immunity agreements are subject to constitutional restraints, foremost of which is the due process clause's overriding guarantee of fundamental fairness to the accused. *Cooper v. United States,* 594 F.2d 12, 17 (4th Cir. 1979), *overruled on other grounds, Mabry v. Johnson,* 467 U.S. 504, 507, 104 S.Ct. 2543, 2546, 81 L.Ed.2d 437 (1984). *See also Surina v. Buckalew,* 629 P.2d 969, 975 (Alaska 1981).

When doubt arises concerning the terms and scope of an immunity agreement, the trial court must consider the totality of the evidence, including the agreement itself and the circumstances under which it was made:

> In determining whether a governmental promise has been made and in ascertaining the scope of any such promise, it is appropriate for a trial court to consider not only the form and content of any written document purporting to incorporate the government's representation to the defendant but also any oral statements made to the defendant as well as extrinsic evidence relating to the circumstances of the government's dealings with the defendant. Consideration of extrinsic evidence is especially appropriate when the written document itself is ambiguous. Under such circumstances, a court's task is not to rewrite the agreement but to construe it in a manner consistent with the intent of the parties and the defendant's right to be treated fairly by the government.

*People v. Romero,* 745 P.2d 1003, 1010 (Colo.1987) (citations omitted).

In keeping with general principles governing appellate review of contract claims, a trial court's findings on the terms and scope of an immunity agreement and on the issue of breach must be upheld unless clearly erroneous. *See, e.g., Geczy v. La-Chappelle,* 636 P.2d 604, 606 (Alaska 1981); *Preferred General Agency of Alaska, Inc. v. Raffetto,* 391 P.2d 951, 952–53 (Alaska 1964).

On the other hand, a trial court decision on the materiality of a breached provision involves issues of law, which are subject to *de novo* review. *See generally* 9 C. Wright & A. Miller, *Federal Practice and Procedure* §§ 2588–89, at 750–59 (1971 & Supp.1987). Decisions on materiality must be based on the totality of the circumstances. *See Restatement (Second) of Contracts* §§ 241–42 (1981). The question is one of degree, centering on the reasonable expectations of the parties. *See generally* A. Corbin, *Corbin on Contracts,* § 946 at 809 (1960); J. Murray, Jr., *Murray on Contracts,* § 167 at 322 (1974).

In the present case, the superior court, after conducting an evidentiary hearing, found that Closson had entered into an agreement in which the state promised to dismiss a pending misdemeanor assault charge and to immunize Closson from prosecution for theft of the pistol that was used to murder Pfeil; additionally, the state undertook to maintain Closson's anonymity during the investigative phase of the case. In exchange, Closson promised to help in the investigation of the Pfeil murder by wearing a transmitting device and participating in conversations with various suspects; Closson also promised to testify truthfully in all future court proceedings related to the Pfeil murder.

The superior court also found that the state had lived up to its obligations but that Closson had breached the immunity agreement on three occasions: first, when he failed to testify truthfully at the search warrant hearing of October 24, 1985; second, when he failed to show up on November 14 for the monitored contact with Jack Peters; and, third, when he failed to appear on November 18 at the grand jury hearing.

The court nonetheless concluded that the first two breaches were excused. The first, Closson's failure to testify truthfully at the October 25 search warrant hearing,

was excused by the state's willingness to continue working with Closson despite his untruthful testimony. The second, Closson's unwillingness to contact Jack Peters, was excused by his reasonable fear that the police could not adequately protect him from danger in the event of a sudden attack by Peters.

The court found no excuse for Closson's failure to testify before the grand jury, however, and found this breach to be material. Accordingly, the court concluded the state was justified in terminating the immunity agreement and charging Closson with theft.

On appeal, Closson challenges the trial court's ruling on numerous grounds. Almost all of Closson's arguments relate to the scope of the agreement and to the issue of breach. Because these arguments raise questions of fact, their resolution by the trial court is conclusive unless the court's findings are clearly erroneous.

■ Closson initially contends that a grand jury hearing is not a "court proceeding" and argues that he therefore cannot be held to have violated the terms of his immunity agreement by failing to testify before the grand jury. Based on the evidence presented below, however, the superior court could properly find that the grand jury hearing was a proceeding included within the scope of the immunity agreement.

■ Closson argues that he was not properly notified of the grand jury hearing and that he was never served with a subpoena to appear. There is substantial evidence in the record, however, to support the trial court's finding that Closson was told his testimony was needed and was given adequate notice of the time and place of the grand jury hearing. Nothing in the record substantiates Closson's assertion that, under the terms of the immunity agreement, his duty to testify was predicated on the formal service of a subpoena.

■ Closson insists that it was the state that breached the agreement by breaking its promise to keep Closson's participation as an informant confidential. There was nevertheless ample evidence presented below to support the court's conclusion that the state had lived up to its end of the bargain. The court was not clearly erroneous in finding that Closson was promised confidentiality only during the investigative phase of the case and that the state complied with this promise by maintaining Closson's confidentiality until filing formal charges against the Pfeil murder suspects on November 11, 1985.

■ Closson nevertheless suggests that the state's decision to reveal his identity as an informant placed him in jeopardy, precluding his appearance before the grand jury. Closson points to the court's finding that his failure to engage in a monitored conversation with Jack Peters was excused by his reasonable fear for his own safety. The court's finding, however, was apparently based on specific evidence establishing that the police could not have fully protected Closson against the possibility of a sudden attack by Peters. There was no comparable evidence that Closson had any reasonable cause to believe that adequate precautions could not be taken to assure his safety as a witness before the grand jury. Accordingly, the court was not clearly erroneous in finding that Closson's breach of the immunity agreement was not excused.

■ Closson alternatively contends that, even if his failure to testify before the grand jury amounted to an unexcused breach, the breach was not material, because the state managed to secure an indictment against the Pfeil murder suspects without his testimony. This argument confuses the materiality of a breach with its resulting prejudice. As we have indicated, the materiality of a breach depends on the totality of the circumstances in each case. Here, Closson's promise to testify in all court proceedings relating to the Pfeil murder was a central component of the immunity agreement. His failure to testify before the grand jury constitutes a material breach, despite the state's ability to secure

an indictment in Closson's absence.[1]

We find no error in the superior court's denial of Closson's motion to dismiss.

### III. Motion to Suppress

Closson moved to suppress all statements that he made to the police. The trial court ruled that all statements made after Closson entered into the immunity agreement were inadmissible but that all statements preceding the agreement could be used in evidence. On appeal, Closson contends that his pre-agreement statements should have been suppressed because he was subjected to custodial interrogation without *Miranda* warnings.

In rejecting the same argument, the trial court found, after an evidentiary hearing, that Closson had not been subjected to custodial interrogation. The court found that Closson came to the police station of his own accord, that the police expressly told him he was free to leave and was not under arrest, and that he thereafter voluntarily admitted his theft of the pistol. Although the court found that Closson was briefly placed in handcuffs on two occasions that day, the court also found that the handcuffs were put on with Closson's express consent, for the sole purpose of creating the appearance, in the presence of other people, that Closson was not cooperating with the police.

The record contains substantial evidence to support the trial court's factual findings. We hold that the trial court was not clearly erroneous in deciding that Closson was not subjected to custodial interrogation. *See State v. Ridgely,* 732 P.2d 550, 554 (Alaska 1987); *Hunter v. State,* 590 P.2d 888, 892–98 (Alaska 1979).

Closson separately contends that the trial court erred in suppressing only those statements made after Closson's meeting with Assistant District Attorney Stephen Branchflower. Closson reasons that his immunity agreement was concluded before Branchflower arrived at the police station, or, alternatively, that his statements to the police prior to Branchflower's arrival were induced by promises of leniency.

Again, however, the trial court was not clearly erroneous in finding that no agreement was made until after Branchflower had arrived at the police station and that the police gave no assurances of immunity prior to Branchflower's arrival. Having independently reviewed the record, including the transcript of Closson's interrogation by the police, we find no basis for concluding that Closson's pre-agreement statements were improperly induced by express or implied promises of leniency, or that the statements were otherwise involuntarily given. *See Ridgely,* 732 P.2d at 554; *Stobaugh v. State,* 614 P.2d 767, 771–72 (Alaska 1980). Accordingly, the trial court did not err in declining to suppress the pre-agreement statements.[2]

### IV. Grand Jury Joinder

Closson was indicted jointly with various individuals accused of Pfeil's murder. His case was thereafter severed for trial. Closson moved to dismiss the indictment on grounds that he had been prejudiced by joinder of his case with those of the Pfeil murder suspects. The trial court denied Closson's motion. Closson renews his argument on appeal.

1. Closson argues that the question of whether he breached the immunity agreement should have been submitted to the jury. This argument is frivolous. Although the question of whether Closson breached the immunity agreement is a question of fact, the factual issue bears exclusively on the legal question of whether Closson was entitled to specific performance of the immunity agreement. This legal question is wholly unrelated to the elements of the offense with which Closson was charged or to any defense or justification. Accordingly, the issue of Closson's compliance with the immunity agreement was properly decided by the court, and not by the jury. *See United States v. Krasn,* 614 F.2d 1229, 1233 (9th Cir.1980).

2. Closson does not argue on appeal and did not argue below that his pre-agreement statements were inadmissible under Alaska Rule of Evidence 408 (evidence of a compromise or an offer to compromise is inadmissible). Accordingly, we express no view concerning the possible applicability of the rule.

■ Joinder before the grand jury is not impermissible merely because joinder at trial would be improper. *Bangs v. State*, 663 P.2d 981, 982 (Alaska App.1983). Joinder of defendants is covered by Alaska Criminal Rule 8(b), which provides:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. . . .

In the present case, there was at least arguably a sufficient nexus between Closson's theft and the Pfeil shooting to justify joinder before the grand jury. Closson has cited no authority to the contrary.

■ Even assuming that joinder was improper, the appropriate remedy, as recognized by the trial court, was severance. Abundant evidence was presented to the grand jury to support Closson's theft charge. We find no basis for concluding that the grand jury's decision to charge Closson with theft was appreciably affected by his joinder with the Pfeil murder suspects. Accordingly, the superior court did not err in denying Closson's motion to dismiss.

## V. Evidence of Other Misconduct

■ Over Closson's objection, the trial court allowed the state to play a tape recording of Closson's October 24 statement to the police, thereby establishing that the gun Closson was accused of stealing was the murder weapon in the Pfeil case. Closson argues that the trial court's ruling amounted to an abuse of discretion. He contends that evidence of the gun's eventual link to the Pfeil murder was far more prejudicial than probative.

The trial court's decision, however, was specifically predicated on the defense that Closson adopted to the theft charge. Upon inquiry by the court, Closson declared his intention to claim that he had not stolen the pistol. Closson asserted that the gun had been stolen by his girlfriend. Closson claimed that he gave a false statement to the police on October 24, admitting the theft only to protect his girlfriend.

Given this defense, the trial court correctly recognized that full disclosure of Closson's October 24 statement and of the circumstances in which it was given became highly probative. Without hearing the statement and understanding the full context in which it was given, the jury would have been deprived of any realistic chance to evaluate Closson's contention that his October 24 confession was false. For this reason, we find no abuse of discretion in the trial court's decision to admit the challenged evidence.

■ Closson similarly contends that the trial court erred in admitting evidence that he eventually traded the stolen gun to Jack Peters for a small quantity of cocaine. Again, however, we find no abuse of discretion.

Closson's defense depended on his claim that the October 24 confession was false. The one demonstrably false aspect of the October 24 confession was Closson's statement that he had thrown the stolen pistol into the inlet. The fact that Closson had given the police a false account of the manner in which he disposed of the gun could appear to bolster his claim that the October 24 statement was false in its entirety.

It was thus highly relevant for the state to establish that Closson had a specific motive to fabricate the part of his story that dealt with his disposal of the weapon. Closson's desire to avoid revealing his involvement in a drug transaction with Peters—a separate crime that would not have been covered by his immunity agreement—could well have provided Closson with a reason for relating a false story concerning his disposal of the stolen gun, while remaining basically truthful in the balance of his October 24 confession.

Under the circumstances, we find no abuse of discretion in the admission of the challenged evidence.

### PERJURY—CASE NO. A–2019

#### I. Facts

During his testimony at an omnibus hearing on his theft charge, Closson ac-

cused Assistant District Attorney Stephen Branchflower of coaching the testimony that Closson gave at the October 24, 1985, search warrant hearing. According to Closson, Branchflower had signaled Closson how to answer questions by nodding his head, and Closson had answered the questions accordingly.

Following his conviction of the theft charge, Closson was indicted for perjury based on this omnibus hearing testimony. Closson claims on appeal, as he did below, that the perjury charge is improper for a variety of reasons.[3]

## II. Double Jeopardy

■ Closson initially argues that the perjury charge was barred by double jeopardy because the court took his perjury into account in sentencing him on the theft charge. Closson acknowledges that the double jeopardy clause of the United States Constitution would not bar his conviction. *See United States v. Grayson*, 438 U.S. 41, 52–54, 98 S.Ct. 2610, 2616–18, 57 L.Ed.2d 582 (1978). He nevertheless contends that Alaska's double jeopardy clause provides broader protection.

■ We find no merit in Closson's double jeopardy argument. To the extent that Closson's false testimony at the theft trial tended to demonstrate his poor prospects for rehabilitation, the sentencing court was entitled to consider it in imposing his theft sentence. *See, e.g., Campbell v. State*, 594 P.2d 65, 67–68 (Alaska 1979); *Fox v. State*, 569 P.2d 1335, 1338 (Alaska 1977); *DeMan v. State*, 677 P.2d 903, 911 (Alaska App. 1984); *Willard v. State*, 662 P.2d 971, 979 (Alaska App.1983). If the court gave inordinate weight to Closson's lack of candor in imposing sentence for the theft charge, Closson's remedy was to challenge the theft sentence—a remedy that he has elected not to pursue. Whether properly or improperly imposed, the theft sentence poses no bar to a separate conviction and sentence for Closson's perjury at his omnibus hearing.

## III. Prosecutorial Vindictiveness

Closson also asserts that he was the victim of prosecutorial vindictiveness. *See, e.g., Atchak v. State*, 640 P.2d 135, 140 (Alaska App.1981). This claim is based in part on the premise that Closson had a right to cease cooperating with the police when the state violated the immunity agreement. Our conclusion in Case No. A–1589 that the state did not breach the immunity agreement is dispositive of this aspect of Closson's vindictiveness claim.

■ Closson also suggests that his perjury prosecution was an act of retaliation for his assertion of his right to trial on the theft charge. The perjury charge, however, arose from conduct that did not even occur until well after Closson asserted his right to a trial on the theft charge. Consequently, the perjury charge does not give rise to an appearance of vindictiveness.

■ Finally, Closson suggests that the perjury charge was brought in retaliation for his exercise of the "right to retract statements made while under the impression that he was immune from prosecution." This is tantamount to an assertion that Closson had a right to commit perjury while immunized. There is, of course, no such right. *See, e.g.,* 1 W. LaFave & J. Israel, *Criminal Procedure* § 8.11(b), at 685 (1984). In any event, Closson was not convicted for false testimony while under immunity, but rather for false testimony at his omnibus hearing, well after he had breached the immunity agreement.

## IV. Selective Prosecution

■ Closson asserts that he was the subject of selective prosecution. To establish selective prosecution, Closson must meet a three-fold burden:

To support this defense, the defendant must prove, first, that other persons similarly situated to the defendant and equally subject to prosecution were not proceeded against; second, that the defendant was singled out as a result of a conscious, deliberate, and purposeful de-

---

**3.** Closson was also indicted for a separate count of perjury based on his trial testimony. He subsequently pled no contest to that charge, which is not at issue in this appeal.

cision; and, third, that the discriminatory selection of the defendant was based upon an arbitrary, invidious, or impermissible consideration.

B. Gershman, *Prosecutorial Misconduct* § 4.3(a)(3), at 4–13 (1985); *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir.1974); 2 W. LaFave & J. Israel, *Criminal Procedure* § 13.4(a), at 185 (1984).

■ Here, no showing has been made that the state decided to forego the prosecution of any similarly situated person,[4] that Closson was singled out for prosecution, or that the decision to single him out for prosecution was based on arbitrary, invidious, or impermissible considerations. In short, Closson has failed to meet the burden of showing selective prosecution.

## V. Admission of Closson's Confession

■ Over Closson's objection, the trial court allowed the state to play a tape recording of Closson's October 24 confession to the police. Closson contends that the court's ruling was error. We disagree.

The challenged evidence was admitted to show that, before testifying at the October 24 search warrant hearing, Closson had given the police a statement that was consistent with the search warrant testimony that Closson claimed to have been coached. Although Closson correctly notes that the truthfulness of his testimony at the search warrant hearing was not directly at issue in his perjury prosecution, he fails to recognize that the prior consistent statement was nevertheless highly relevant.

At issue in the perjury prosecution was whether Assistant District Attorney Branchflower had coached Closson's testimony during the search warrant hearing. By demonstrating that, immediately before the search warrant hearing, Closson had, of his own accord, given a narrative account of the theft that was fully consistent with his testimony at the warrant hearing, the state was able to prove that Branchflower had no need to provide Closson with guidance as to how to answer questions during the search warrant hearing. This, in turn, had a direct bearing on the central issue in the perjury trial: whether Closson had lied in claiming that Branchflower had coached Closson's testimony at the search warrant hearing.

We find no error in the trial court's conclusion that the challenged evidence was relevant. Nor can we fault the trial court for concluding that, under the circumstances, the probative value of the challenged evidence outweighed any potential for prejudice that it might have. *See* A.R.E. 403. In this regard, we note that the court ordered the October 24 statement redacted to reduce the possibility of prejudice and gave an appropriate limiting instruction.

## VI. Exclusion of Favorable Evidence

■ Closson attempted to present evidence concerning the circumstances surrounding the breakdown of his immunity agreement. The trial court allowed the jury to be told that the immunity agreement had broken down, but precluded evidence detailing the circumstances surrounding the breakdown. On appeal, Closson makes a conclusory allegation that the court infringed his right to present favorable evidence in his own behalf.

The trial court's exclusion of the disputed evidence was based on its understandable desire to avoid digressing into a mini-trial on the issue of who bore the

---

**4.** Closson bases his claim of selective prosecution on the assertion that police Sergeant Michael Grimes also perjured himself during Closson's omnibus hearing but was not prosecuted. Grimes testified that Closson was never handcuffed during his interrogation by the police on October 24, 1985. Grimes' testimony was contradicted by Investigator Spadafora, who established that Closson had consented to be handcuffed briefly on two separate occasions that day, in order to create the impression that he was not cooperating with the police. It appears, however, that Closson was handcuffed by Spadafora, not by Grimes. There is nothing in the record to establish that Grimes was with Spadafora and Closson when he was handcuffed or that Grimes was otherwise made aware that Spadafora placed Closson in handcuffs. Under the circumstances, the mere fact that Grimes' testimony was inconsistent with Spadafora's does not give rise to the inference that Grimes knew his omnibus hearing testimony to be untruthful.

responsibility for the breakdown of the immunity agreement. The jury was informed of the existence of the agreement and of the fact that it had broken down. Closson has failed to specify exactly how a knowledge of the details of the breakdown would have been of any further assistance to the jury. Under the circumstances, we find no abuse of discretion in the exclusion of the disputed evidence.

### VII. Motion for Mistrial

■ At Closson's trial, the court directed the state to edit the tape recording of Closson's testimony at the October 24 search warrant hearing by deleting a statement in which Closson disclosed that he had stolen the pistol because he wanted to kill a man named Mike Sousa. By an oversight, the statement, though deleted from the tape recording that was played to the jury, was left in a typed transcript of the testimony that was given to jurors for reference while the recording was being played. Closson moved for a mistrial. The trial court, concluding that the possibility of prejudice was relatively slight, denied a mistrial but offered to give a cautionary instruction.

■ The trial court is vested with broad discretion to determine when a mistrial is necessary; a cautionary instruction will ordinarily be presumed sufficient to cure the inadvertent disclosure of improper evidence. *See Hines v. State*, 703 P.2d 1175, 1178 (Alaska App.1985); *see also Preston v. State*, 615 P.2d 594, 603 (Alaska 1980). Here, the jury had previously been given a general instruction that the written transcript was not evidence and that in the event of any discrepancy between the transcript and the tape recorded statement, reliance was to be placed on the recording. Moreover, the written transcript was taken from the jury immediately after the tape was played. In denying Closson's motion for a mistrial, the court noted that, if the jury requested a playback of Closson's October 24 testimony, a properly edited transcript could be substituted. We find no abuse of discretion in this case.

### VIII. Prosecutorial Misconduct

Closson alleges that the prosecution made numerous improper statements in the course of its final argument to the jury. Closson failed to object to any of the alleged instances of impropriety. Having carefully reviewed the entire final argument, we conclude that, if any impropriety occurred, it fell far below the mark for plain error. *United States v. Young*, 470 U.S. 1, 14–20, 105 S.Ct. 1038, 1045–49, 84 L.Ed.2d 1 (1985); *Potts v. State*, 712 P.2d 385, 390–95 (Alaska App.1985); *see generally Dunlop v. United States*, 165 U.S. 486, 498, 17 S.Ct. 375, 379, 41 L.Ed. 799 (1897).

### CONCLUSION

Closson's judgments of conviction for theft and perjury are AFFIRMED.

SINGLETON, J., not participating.