[No. 2831-3.   Division Three.   June 7, 1979.]

The State of Washington, *Respondent*, v. Brett A. Johnson, *Appellant*.

*Robert V. Flock*, for appellant (appointed counsel for appeal).

*Stephen L. Henley, Prosecuting Attorney*, and *Douglas S. Boole, Deputy*, for respondent.

ROE, J.—This is a case of "cattle rustling in a cow county," as characterized by counsel. As background, defendant Brett Johnson, 18 years of age, lived on the reservation in Okanogan County. He was charged with a class C felony, second–degree theft, involving some tools and other property of a Mr. Lockwood. The penalty is not more than 5 years' imprisonment, a $5,000 fine, or both. While this class C felony charge was pending, Johnson went to Harden County, Kentucky, for National Guard basic training. While there, he was visited by Captain Fitzhugh, an Okanogan County deputy sheriff, who went to bring defendant back on the second–degree theft charge. Fitzhugh was aware that Johnny Pitts' cow was missing and that Johnson, Mike Moore, and Bill Daniels might be implicated. Fitzhugh and Johnson talked en route from Kentucky. As a result, Johnson felt that Fitzhugh told him that Daniels and Moore had incriminated Johnson in the Lockwood tool theft, but if Johnson would testify against Daniels and Moore as to the cattle rustling charge and all of Moore's illegal activities, then in return, (1) the second–degree Lockwood theft charge would be reduced to third–

degree theft, a misdemeanor; (2) a 1–year suspended jail sentence would be recommended; and (3) Johnson would not be prosecuted for his involvement in the theft of Pitts' cow. Johnson's story, which inculpated Moore in the cattle theft, was tape recorded. Johnson had taken a polygraph test and had passed it, which indicated that he gave truthful answers to the sheriff.

The prosecutor approved the agreement. The State reduced the Lockwood theft charge to a misdemeanor and Johnson was permitted to return to Kentucky to finish his training. Later, he was given a transcript of the conversations that Moore and Daniels had priorly had with Fitzhugh. Johnson then believed that he was misled, if not duped, and that Moore and Daniels really had not incriminated Johnson, at least to the extent he thought.

Curiously, after he had told the officers where the hide of the missing cow was, Johnson went to work at Moore's ranch. The hide was found in a pond. The cow had wandered onto Moore's ranch, Johnson shot it, and it was then skinned and eaten.

When Fitzhugh came to the ranch to arrest Moore, he was surprised to find Johnson working there. Fitzhugh arrested Moore, but graciously gave him 45 minutes additional time so he could finish some work. Moore was asked to report to the sheriff's office. Fitzhugh also wanted to talk to Johnson, so he asked him to get in the patrol car to go to the sheriff's office. As discussed below, Johnson was later charged with theft of livestock, a felony.

During the hearing on the motion to dismiss this information, Johnson testified that he was scared during the ride back with the deputy sheriff. Firstly, he sat in the back seat of the car where there were no door handles, whereas usually he sat in the front seat beside the sheriff. He said he didn't know whether the sheriff would follow the agreement. En route to the sheriff's office and in the office, Johnson was asked if he would cooperate. He did not refuse to do so, but asserted that he wanted to talk to an attorney first. Three times Johnson answered when asked about

Moore's activities, "I do not want to answer any questions now, I want to see an attorney." He also expressed some doubt about Fitzhugh's reliability. According to Fitzhugh's testimony, Johnson's desire to talk to an attorney first seemed unnecessary and unreasonable. This subjective reaction of Fitzhugh is clearly insufficient reason to deprive defendant of his constitutional right to counsel.

On the day of the ride Johnson was booked into jail. One day passed and on the following day the prosecutor, believing that Johnson had breached the plea bargain, filed the new information charging him with theft of livestock, RCW 9A.56.080.[1] The record is silent as to when, but after this information had been filed, Johnson obtained an attorney.

After talking to Johnson, the attorney indicated to the sheriff that Johnson would cooperate, but by then it was too late. A motion to dismiss the information was denied, and defendant was found guilty in a nonjury trial. As authorized by statute, he was sentenced to not more than 10 years on account of this cow. He was committed and served time.[2]

At no time did Johnson refuse absolutely to cooperate. He constantly repeated he wanted to talk to an attorney first. One of the reasons Johnson gave for not cooperating on that particular day was that he wondered if the sheriff would go through with the deal because Johnson felt Fitzhugh had lied to him before.

In its oral opinion, the court emphasized that a condition to the reduction in degree of the Lockwood larceny charge was that Johnson would testify against Moore and "tell all"

---

[1]RCW 9A.56.080:

"(1) Every person who, with intent to deprive or defraud the owner thereof, wilfully takes, leads, or transports away, conceals, withholds, slaughters, or otherwise appropriates to his own use any horse, mule, cow, heifer, bull, steer, swine, or sheep shall be guilty of theft of livestock.

"(2) Theft of livestock is a class B felony."

[2]Although "10 years for a cow," might seem somewhat harsh, the defendant had a juvenile record and the previous conviction for theft. At oral argument the court was advised he was now out on parole.

about Moore's illegal activities. The trial court found that the State had carried out its part of that bargain.

Although the trial court recognized that the defendant had a right to see an attorney, nevertheless, it found that Johnson violated the agreement with the prosecuting attorney that he would tell of "all illegal activities Mike Moore was involved in." The trial court also found that,

Maybe [defendant] didn't say, "I refuse to talk" but certainly the conclusion that one would draw inferentially, at least, if not directly, was that he said, "I won't talk until I see an attorney."

and that considerable time passed by. Meanwhile, the investigation had continued without Johnson's assistance. Thus, the court held that if Johnson violated the agreement, the State was not bound by it and could bring the present theft of livestock charge.

The trial court also said that as to the

interruption of the agreement, the nonfulfillment of the agreement, caused the State, *I presume,* over the elapsed time between then and the final agreement . . . to cooperate . . . caused them to go off in other directions to complete their investigation to come to Court with their case.

(Italics ours.)

The record does not reveal if that was a fact. It does appear, though, that Mike Moore also submitted his case on stipulated facts, no doubt prodded by Johnson's prior disclosures to the sheriff and the finding of the cowhide. He was found guilty and was also sent to the penitentiary. He too was on parole by the time of oral argument.

The trial court, in denying the motion to dismiss the information, said:

[I]t could be—it's a reasonable inference that when the prosecuting attorney and the sheriff's office hear a man say—who has entered into such an agreement—"I don't walk [*sic*] to talk now. I want to see my attorney," that *a reasonable inference from that is that the defendant is not going to say anything more.*

(Italics ours.)

■ In disposing of this case, we proceed under the assumption that a binding agreement was made, and the State fulfilled its agreement as to the first charge. The question before the court is, was defendant's thrice-repeated statement that before he would agree to tell all and testify, he wanted to see an attorney, a breach of the agreement. If so, was it such a material breach that justified rescission of the promise not to charge the defendant with cattle theft.

The State asserts that *State v. Yates,* 13 Wn. App. 116, 533 P.2d 846 (1975), controls. There, defendant was charged with first-degree forgery and agreed to plead guilty with the understanding the prosecutor would recommend a deferred sentence. Before this could be accomplished, the prosecutor recommended to the court that defendant be released for a medical evaluation at the Veteran's Hospital, but the defendant fled the state. The defendant was recaptured and the prosecutor failed to recommend a deferred sentence. Since the defendant did not keep his promise to return for imposition of sentencing after his visit to the Veteran's Hospital, defendant breached the understanding. Thus, the prosecutor was no longer required to recommend a deferred sentence. In the above case, there was an univocal, open, obvious and detrimental breach of the agreement by the defendant. Hence, it is not controlling.

In *Santobello v. New York,* 404 U.S. 257, 30 L. Ed. 2d 427, 92 S. Ct. 495 (1971), a plea bargain agreement had been reached by which one deputy prosecutor agreed not to recommend a sentence. Before the time of sentencing arrived, a new deputy presented the case and recommended a period of incarceration. Even though the sentencing judge said he disregarded it and relied wholly on the presentence report, nevertheless, in discussing plea bargaining, the court stated:

The disposition of criminal charges by agreement between the prosecutor and the accused, sometimes

loosely called "plea bargaining," is an essential component of the administration of justice. Properly administered, it is to be encouraged. If every criminal charge were subjected to a full-scale trial, the States and the Federal Government would need to multiply by many times the number of judges and court facilities.

Disposition of charges after plea discussions is not only an essential part of the process but a highly desirable part for many reasons. It leads to prompt and largely final disposition of most criminal cases; it avoids much of the corrosive impact of enforced idleness during pretrial confinement for those who are denied release pending trial; it protects the public from those accused persons who are prone to continue criminal conduct even while on pretrial release; and, by shortening the time between charge and disposition, it enhances whatever may be the rehabilitative prospects of the guilty when they are ultimately imprisoned.

*Santobello v. New York, supra* at 260–61.

The circumstances of a plea will vary but a constant factor is that:

when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.

*Santobello v. New York, supra* at 262. The *Santobello* court held that the judgment be vacated and remanded since the prosecutor, albeit inadvertently, had violated that part of the agreement with reference to no recommendation of imprisonment.

■ In *Cooper v. United States,* 594 F.2d 12 (4th Cir. 1979), the prosecutor's office had offered a plea bargain; defendant had agreed to accept through his counsel, but before counsel was able to communicate the acceptance, a superior officer to the prosecutor attempted to withdraw it. The court enforced it. As stated in *Cooper* at 15–16:

Both before and since *Santobello,* the courts have understandably drawn heavily on the ready analogies of substantive and remedial contract law to supply the body of doctrine necessary to order plea bargaining practices

and to afford relief to defendants aggrieved in the nego-tiating process. . . . That is the precise issue presented in this case, where we are asked to find and enforce a right probably lying beyond any provided by contract law analogy.

Disregarding promissory estoppel in that case, because there was lack of any tangible detrimental reliance by the defendant upon a plea bargain agreement, the court stated:

We begin by noting that two distinct sources of consti-tutional right are involved here: most obviously and directly, the right to fundamental fairness embraced within substantive due process guarantees; less directly perhaps, but nonetheless importantly, the Sixth Amend-ment right to effective assistance of counsel. The general relevance of the former is too plain to require discussion. That of the latter can be readily stated.

*Cooper v. United States, supra* at 18. In some federal courts the prosecutor may be required to conduct plea bar-gaining negotiations through defense counsel. The court stated at page 18 that

communications in plea discussions are necessarily medi-ated to the defendant through his counsel. . . . For this reason, not only the credit and integrity of the govern-ment but those of his counsel are involved in a defend-ant's perception of the process.

The court further stated, however, at page 20:

We must recognize, however, that our failure to find con-stitutional right and violation in this case would neces-sarily give judicial approval to a practice whose possibilities for easy abuse, or at least the appearance of abuse, are abundantly clear.

We believe disposition of the instant case is controlled by the rationale of *Cooper v. United States, supra.*

Here, the defendant had the right to have counsel in plea negotiations under the sixth amendment to the Constitu-tion of the United States, and article 1, section 22, of our state constitution, and at public expense if indigent, RCW 10.01.110. We find nothing unreasonable in defendant's request for counsel in plea bargaining. In fact, it is custom-ary. Most lawyers would advise it for their clients so that

their precise legal rights could be understood and protected.

Johnson was booked and jailed on the very afternoon that he made the request for counsel. As of that time, the State considered the agreement breached, even though the State did not show it had suffered any detriment.

Even in a forfeiture of a contract, some notice or warning is usually required with an opportunity to cure the delinquency. The record does not show that Johnson was notified on the day he was given the back seat ride that if he didn't unequivocally consent to talk without counsel that the deal was off, and that felony charges would be filed for the cow theft.

We hold the State's action in such a short time is unreasonable and also an unreasonable deprivation of the right to counsel. It violated Johnson's reasonable expectations, particularly when a 10–year sentence was in the balance and he had previously cooperated. Johnson had been found to be truthful; there was no showing trial was imminent or of any actual prejudice to the State. There was nothing in the agreement made with the prosecutor or the sheriff that Johnson could not ask to seek counsel or that he would agree to tell all about Moore at all times immediately upon request.

He should have been given a reasonable time to fulfill his part of the bargain and an opportunity to consult counsel. There is no showing that an additional investigation or effort on the part of the prosecutor was necessary, or that the State suffered more than annoyance, irritation and some delay.

This is not a case where one under a plea bargaining agreement had refused to testify at a trial or where one called as a witness had recanted his story or had been found to have lied to the prosecutor or the sheriff or that immediate need of his testimony was essential. Although there may have been a technical breach by the defendant, at best it was not substantial enough to justify releasing the prosecutor from his part of the bargain at least without

express notice. The State had reaped part of the benefit of its bargain and was therefore bound to give the defendant a reasonable time under reasonable conditions to fulfill his part.

■ Obviously, it would be impracticable to remand this case for specific performance. Mike Moore, the target of the bargain, was convicted of the felony and sentenced. The legitimate interests of the State in law enforcement have been satisfied. Brett Johnson has also spent time in the penitentiary. Courts are fashioning ad hoc remedies for a violation of a plea bargain. Accordingly, we reverse with directions to vacate the judgment and conviction of theft of livestock and dismiss the charge.

GREEN, C.J., and MCINTURFF, J., concur.

Reconsideration denied July 10, 1979.

Review denied by Supreme Court October 12, 1979.