**Tyoga G. CLOSSON, Petitioner,**

v.

**STATE of Alaska, Respondent.**

**No. S–3722.**

Supreme Court of Alaska.

June 7, 1991.

Rex Lamont Butler, Anchorage, for petitioner.

David Mannheimer, Asst. Atty. Gen., OSPA, Anchorage, Douglas B. Baily, Atty. Gen., Juneau, for respondent.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Justice.

A jury convicted Tyoga Closson of theft in the second degree. The court of appeals affirmed the conviction. *Closson v. State,* 784 P.2d 661 (Alaska App.1989). We granted Closson's petition for hearing on the questions of whether the state violated its obligations under an immunity agreement with Closson, and whether Closson was consequently entitled to have the immunity agreement specifically enforced.

## I. FACTS AND PROCEEDINGS

In October 1985, Closson stole a .45 caliber pistol from an Anchorage home where his girlfriend was housesitting. A friend and sometime roommate of Closson's, Robert Betts, acquired the gun from Closson. Betts loaned the gun to John Bright, who used it on October 12, 1985 to shoot and kill Robert Pfeil in a murder for hire drive-by shooting. Betts drove the car for Bright. Betts then returned the gun to Closson, who traded it to Jack Peters for cocaine.

Later that month, Inspector Ken Spadafora of the Anchorage Police Department learned that Closson had been speaking of his involvement in the Pfeil shooting. Spadafora left a message at Closson's apartment for Closson to contact the Anchorage police.

On the morning of October 24, 1985, Closson went voluntarily to the police station where he was questioned by Spadafora and Police Sergeant Michael Grimes. The officers did not give Closson a Miranda warning, but they did tell him he was free to leave. This interrogation was tape-recorded. During that interrogation, Closson admitted his theft of the gun, and ex-plained how it was involved in the Pfeil shooting. Grimes and Spadafora urged Closson to cooperate with the police, assuring him that he would otherwise face grave consequences, both from the authorities and his acquaintances. Closson agreed to cooperate and to "wear a wire" when talking with Betts.

Assistant District Attorney Stephen Branchflower then arrived at the interrogation room. Branchflower was concerned about Closson's youth and consequently he first determined that Closson was indeed eighteen years old. Shortly after Branchflower began to speak with Closson, the tape recorder was turned off, apparently by accident. The parties agree that in the course of this conversation, Branchflower offered Closson immunity from prosecution for the gun theft and arranged to have the Municipality of Anchorage drop a pending assault charge in exchange for Closson's cooperation in the investigation. Branchflower did not reduce the immunity agreement to writing.[1]

Branchflower, Closson, and Grimes left the police station and went to the courthouse, where Branchflower prepared an application for a search warrant. Shortly thereafter, the three attended a search warrant hearing in front of District Judge Stewart, where Grimes and Closson explained Closson's role in the investigation, and introduced evidence for the purpose of establishing Closson's credibility as an informant. Both Grimes and Closson testified to the terms of the immunity agreement. Judge Stewart issued the search warrant.

Closson had his first monitored conversation with Betts that night. As a result of the monitoring, the police learned that Closson had lied at the search warrant hearing when he testified that he had thrown the gun into the inlet. Consequently, Branchflower had Closson return to court the following day, to testify that in fact he had traded the gun to Peters. Branchflower's purpose in having Closson

---

1. Branchflower did not have a lengthy conversation with Closson, apparently because all parties were anxious to get started on the investigation.

return before Judge Stewart was to keep the court apprised of developments, in view of the fact that Closson's testimony had been the basis for the search warrant. Branchflower indicated his intention to continue using Closson as an informant; he did not request any change in the immunity agreement or search warrant.

After hearing this testimony, Judge Stewart did not rescind the warrant authorizing the electronic surveillance. Subsequently, on at least one occasion, Closson apparently attempted to have a wired conversation with Peters in an effort to recover the gun. However, Closson was unable to make contact with Peters.

Closson did have additional monitored conversations with Betts, however, and he eventually persuaded Betts to cooperate in the investigation. The state admits that Closson's assistance was important in breaking the case. On November 11, 1985, the police arrested Betts, Bright, and other suspects in the case. The suspects were charged by an information which disclosed Closson's involvement in the investigation. The subsequent press coverage published Closson's name and an account of his involvement.[2]

On November 14, 1985, Closson and his grandfather met with Spadafora. Spadafora told Closson that, as part of Closson's agreement, Closson had to wear a wire that night to interview Peters and he had to testify the following Monday before the Grand Jury. Closson expressed anger and concern that his name had been made public. He reluctantly agreed to return that evening and wear the wire. However, Closson never kept that appointment, nor did he show up at the Grand Jury. When Closson failed to appear before the Grand Jury, Branchflower added his name to the bill, and the Grand Jury indicted Closson for second degree theft.

Closson moved for dismissal of the second degree theft charge on several grounds. In part, he alleged that the state had breached the immunity agreement by charging Closson when he had substantially or completely complied with his obligation under the agreement, by disclosing his name to the public, and by requesting that Closson perform further undercover operations after the state had disclosed his name. These allegations form the basis for this petition.

The superior court held an omnibus hearing on February 17–18, 1986. Two issues before the court included the terms of the agreement and the question of breach. At this hearing, Grimes and Branchflower testified that the terms of the agreement clearly specified that Closson had to wear a wire whenever asked and that Closson had agreed to testify at all necessary court hearings. Additionally, Grimes testified that he had made it clear to Closson that Closson would have to testify in public proceedings.

Closson testified at the omnibus hearing that he understood the immunity agreement to consist of a promise that "if Robert Betts turned himself in and cooperated to the fullest extent that they wouldn't prosecute me." He denied that he had agreed to testify at hearings, because "I didn't want any publicity, I didn't want anybody knowing I was involved in any of this garbage." Moreover, Closson testified that he was later assured that if Betts cooperated, "that I wouldn't be bothered no more; that my name wouldn't be in the paper, that I wouldn't have to testify."

To further establish the terms of the agreement, the superior court heard evidence of the testimony at the search warrant hearing, where the state had first put the immunity agreement on the record. At the search warrant hearing, Closson had acknowledged that he agreed to testify at future court hearings.[3] At the omnibus

---

2. Closson alleges that Branchflower participated in a press conference on November 12, in which he announced the arrests and told of Closson's role in the investigation. At the omnibus hearing, Branchflower admitted that he had participated in a press conference, but he stated that he thought it took place at a later date.

3. This testimony was as follows:

Branchflower (questioning Closson): All right. And now, you realize that your cooperation with the police sort of extends to wearing this transmitter as often as they feel you need to and you're also testifying truthfully

hearing, however, Closson asserted that much of his testimony at the search warrant hearing was untrue. He attributed the untruthfulness to an alleged arrangement he had made with Branchflower, whereby Closson would follow Branchflower's testimonial signals and ignore the content of the questions.

The superior court agreed with the state's interpretation of the agreement and rejected Closson's motion to dismiss the theft charge. The court gave the following explanation for its decision:

Having weighed the testimony presented, the court finds that the agreement entered into by the State and Closson for immunity was as testified to on October 24, 1985, during testimony in support of the application for search warrant. The court finds that the terms of the agreement were as follows: The prosecution promised that a pending City assault and battery case would be dismissed and that Closson would not be prosecuted for theft of the gun provided that Closson had no further involvement in the shooting incident than had been disclosed to that point. Closson agreed to cooperate with the police including wearing a transmitter as often as required to by the police and to testify truthfully when called upon to testify at the hearing for the application of search warrant as well as at any other court hearings. Closson had been given assurances by police officers that his name would be kept confidential during the investigation and that they would do whatever necessary to protect his safety.

. . . .

*Enforcement of the Agreement:*

Closson asserts that he is entitled to specific performance of the immunity agreement. The court finds that Closson materially breached the agreement by failing to appear for testimony before the grand jury and that given that breach, the State is not obligated to perform. The court rejects the State's argu-

ment that Closson materially breached the agreement by lying before Judge Stewart on October 24. While this indeed was a breach of the agreement, that breach was excused when the State chose to continue to use Closson under the terms of the agreement. Further, the court finds that Closson breached the agreement by failing to wear a monitoring device for conversations with Jack Peters when instructed to do so by the police on November 14. However, the court finds that breach to be excused by Closson's reasonable fear in participating in the monitoring after public disclosure of his cooperation with the police on November 11. Despite the disclosure of November 11 in the information, the court finds no excuse for Closson's failure to appear before the grand jury for testimony. Closson specifically agreed to testify at further court proceedings. Given that agreement, it is unreasonable to interpret the agreement to totally bar disclosure of Closson's name forever. Closson should have known and must have known that his name would be disclosed at a future date at the conclusion of the investigation. Given the material breach of the immunity agreement, the State is not required to perform its part of the agreement.

Closson was subsequently tried and convicted of second degree theft. In a separate proceeding, he was later convicted of perjury on the basis of his testimony at the omnibus hearing that Branchflower had suborned perjury at the search warrant hearing. The court of appeals affirmed both convictions. *Closson v. State,* 784 P.2d 661 (Alaska App.1989).[4]

In reviewing Closson's claim that the state had breached its immunity agreement with Closson by breaking its promise of confidentiality, the court of appeals concluded that "[t]here was ... ample evidence presented below to support the court's conclusion that the state had lived up to its end of the bargain. The court

today as well as in the future at any other court hearings? That's part of our bargain? Closson: Yes I do.

4. This petition for hearing concerns only the theft conviction, and in particular the immunity agreement.

was not clearly erroneous in finding that Closson was promised confidentiality only during the investigative phase of the case...." *Id.* at 666. Additionally, the court of appeals rejected Closson's claim that he was excused from testifying before the grand jury because of a reasonable fear for his safety; it also rejected his argument that if he did breach the immunity agreement, his breach was not material. *Id.*

This court subsequently granted Closson's petition for hearing on the following question: "Should the state be held to strict compliance with the terms of an immunity agreement where it is found that the state, through its own actions in violating its agreement to maintain petitioner's anonymity, relieved further performance on the part of the petitioner?" As a preliminary matter, however, it must be determined whether the state did, in fact, breach the immunity agreement it had entered into with Closson.

## II. STANDARD OF REVIEW

The court of appeals began its analysis in *Closson* by correctly noting that "[i]mmunity agreements are contractual in nature and general principles of contract law apply to the resolution of disputes concerning their enforcement and breach." 784 P.2d at 664 (citing *United States v. Irvine*, 756 F.2d 708, 710–11 (9th Cir.1985); *United States v. Carrillo*, 709 F.2d 35, 36 n. 1 (9th Cir.1983); *United States v. Brown*, 801 F.2d 352, 354 (8th Cir.1986)). The court of appeals also properly cautioned that "[a]lthough the analogy between immunity agreements and ordinary contracts is useful, immunity agreements are subject to constitutional restraints, foremost of which is the due process clause's overriding guarantee of fundamental fairness to the accused." *Closson*, 784 P.2d at 665 (citing *Surina v. Buckalew*, 629 P.2d 969, 975 (Alaska 1981)). Nevertheless, the court of appeals concluded that the superior court's

findings as to the terms, scope, and breach of this immunity agreement must, under contract law, be upheld unless clearly erroneous. *Closson*, 784 P.2d at 665.

▆▆▆ Under general contract principles, the trial court must determine the terms of an oral agreement, and its decision will be upheld unless clearly erroneous. *See Geczy v. LaChappelle*, 636 P.2d 604, 606 (Alaska 1981). When the government claims that the defendant has breached an immunity or plea bargain agreement, the burden is on the government to prove, by a preponderance of the evidence, that a substantial breach occurred. *United States v. Gonzalez–Sanchez*, 825 F.2d 572, 578 (1st Cir. 1987), *cert. denied, sub nom. Latorre v. United States*, 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987); Annotation, *Necessity and Sufficiency, in Federal Prosecution, of Hearing and Proof with Respect to Accused's Violation of Plea Bargain Permitting Prosecution on Bargained Charges*, 89 A.L.R.Fed. 753 (1988); Note, *The Standard of Proof Necessary to Establish that a Defendant has Materially Breached a Plea Agreement*, 55 Fordham L.Rev. 1059 (1987). A finding of breach will be upheld unless clearly erroneous. *Gonzalez–Sanchez*, 825 F.2d at 579.[5]

## III. DISCUSSION

A. *The superior court's finding that the state had not breached its agreement was clearly erroneous.*

1. The express terms of the agreement.

▆▆ The superior court found that the terms of the immunity agreement were "as testified to" at the search warrant hearing of October 24, 1985, namely that the police had promised Closson anonymity and safety during the investigative phase of the case. While it is not clear that the superior court considered the promises made by the police as enforceable promises incorporated into the agreement, the state now concedes that these promises of anonymity became

---

5. Closson asserts that for an error of constitutional magnitude the standard of review is "harmless beyond a reasonable doubt." We note, however, that here the terms and scope of an immunity agreement are clearly within the purview of the court as fact finder. These terms do not impact upon a finding of guilt or

innocence. Here, they do not impact on immunized testimony or other constitutional rights. Therefore, the findings of the superior court as to the terms of the immunity agreement are reviewable under a clearly erroneous standard.

part of the immunity agreement.[6] Closson disputes the state's contention that the assurances of confidentiality applied only to the investigative phase of the case and maintains that "the police promised Mr. Closson complete anonymity."

The first promise of confidentiality was made by Grimes during Closson's initial police station interrogation:[7]

> Closson: "I got the gun and I'm gonna get stiffed...."
> Grimes: "Not if you, we can work together here guy, if you weren't involved in it, can do a lot."
> Closson: "Sure *I'll help you back here behind, but there's no way in hell I'll let anybody know what ... I'm doin'.*"
> Grimes: *"No one's gonna know.* But you gotta be straight up with us."

. . . .

> Grimes: "... just totally cooperate with us, you cooperate with us, we'll get these people off the street, *they won't touch you, I'll guarantee you that.*"

(Emphasis added.) This text does not limit the promise of confidentiality and safety to the duration of the investigation. Rather, it seems that Closson was conditioning his cooperation on assurances of anonymity.

In addition, no evidence exists that Branchflower and Closson expressly agreed to any arrangement which would supersede promises made by Grimes.[8] Branchflower himself relied on the substance of the conversation between Closson and the police to establish the parameters of the immunity agreement. Therefore, we

---

6. At the omnibus hearing, Grimes conceded that he had promised Closson "all the protection that was necessary" and anonymity "during the time he was working with us." We have previously found a prosecutorial promise of immunity binding on the state, even in the absence of a statutory grant of authority. *Surina v. Buckalew*, 629 P.2d 969, 975 (Alaska 1981). Here, because the state admits that the promises made by the police officers became part of the agreement, we need not reach the question of whether these police officers had authority to bind the state. We nevertheless must determine the scope of that promise; while the state concedes that the promise was binding, it cannot unilaterally determine the scope of its promise.

7. Although an avowed purpose of the state at the search warrant hearing was to put the terms of the immunity agreement with Closson on the record, no testimony about the promise of confidentiality was given. Consequently, to try and reconstruct the scope of this promise, we must go to other evidence in the record.

8. The record contains some assertions by prosecution witnesses as to what Closson "understood," but does not contain any evidence of an express limit to the promise of confidentiality. From this, we conclude that these witnesses were inferring an implied limit to the scope of the agreement from Closson's promise to testify in court proceedings.

For evidence of an express term limiting the promise of confidentiality, we look first to the testimony at the search warrant hearing. Branchflower later testified that at the time he called Closson as a witness for the purpose of obtaining a search warrant, he did not know the details of Closson's conversation with Grimes. Moreover, at the search warrant hearing, Branchflower did not testify to the terms of the immunity agreement himself; rather, he asked Grimes to explain the immunity agreement to the court. At the search warrant hearing, Grimes did not testify to any promise of anonymity. Nor did he testify to a promise by Closson to testify in open court. Instead, Grimes testified,

> Branchflower (questioning Grimes): "Now, why don't you just recite for the court what promises have been made to Closson in exchange for his cooperation with the police? And include in your answer, if you would, what it is he's agreed to do."
> Grimes: "The promises made to Closson, my understanding at this time, is that he had a pending assault and battery charge, which dates back, I think, a month or 2. That the case against him would be dropped in regards to the assault and battery. Additionally, that for the theft of the weapon from the residence of Dan Coffey, which hadn't been reported yet, by the way, he will not be charged with. In return for this, he has agreed to have further conversations, as many as necessary, with Robert Betz, [sic] and particularly talk about the shooting incident, the disposition of the gun that was used, the vehicle that was used, other persons involved, and possibly who paid money to have the shooting done. Also, he will make every attempt possible to have a face-to-face meeting with this John, possibly last name of Bright to determine the same information...."
> Branchflower: "All right. And did you speak to Closson and caution him about the need for telling the truth, especially during any court hearings?"
> Grimes: "Yes I did."

Grimes later testified that he was present during the entire time that Branchflower spoke to Closson when the immunity agreement was arranged at the police station; therefore, Grimes' testimony at the search warrant hearing about

conclude that there was no express term in the immunity agreement which limited the scope of the promise of anonymity to the investigative phase of the case.

## 2. The implied limits to the scope of the agreement.

The superior court found the promise of confidentiality limited because "Closson specifically agreed to testify at further court proceedings." From this agreement, the superior court concluded that "it is unreasonable to interpret the agreement to totally bar disclosure of Closson's name forever. Closson should have known and must have known that his name would be disclosed at a future date at the conclusion of the investigation." Given that the scope of the immunity agreement was at best ambiguous, the superior court may infer a "reasonable" limit to the promise of anonymity. We hold, however, that the state's action of disclosing Closson's name to the press, via the information filed on November 11 and the press conference held on November 12, was not reasonable in light

of its promise of confidentiality and safety and its request to Closson on November 14 that he perform further investigative work for it.

The superior court's interpretation of the scope of the promised confidentiality presupposes that a reasonable person would have understood the agreement to imply an acceptance of public disclosure.[9] However, a reasonable person would not make such an inference from this record, much less a reasonable person of Closson's youth and education. Indeed, when Branchflower was questioned about the promise of confidentiality, he could not rule out the possibility that he might have made such a promise without limiting its scope. However, he indicated that it was extremely unlikely, based on his specialized knowledge as a prosecutor, that an informant's name is generally made public.[10]

It is not general knowledge that the name of an informant "would have to appear at the foot of the indictment" or "would be discoverable to any defendants that were to be charged in the future."

the terms of the agreement is the best evidence of any agreement between Closson and the state subsequent to Closson's initial interrogation. Branchflower testified at the omnibus hearing that he explained to Closson "that he would have to wear the appropriate gear, the electronic gear, as requested by the police, as often as they requested, for as long as they requested" and that "he'd be required to give testimony, that he would have to give that testimony as often as called upon to do so, and that during his testimony he would have to give truthful answers." However, while Branchflower admitted that he was aware that Closson was concerned about publicity, he could not recall discussing publicity with Closson:

Butler (Closson's attorney, questioning Branchflower): "Do you recall or were you told that [Closson] didn't want his assistance to be made public?"
Branchflower: "I'm sure he expressed a concern for that."
Butler: "Okay. And what was your response?"
Branchflower: "I don't have any idea what my response was."

At the omnibus hearing, Grimes testified that he had promised Closson anonymity "during the time he was working with us." At that hearing, Grimes was also asked, "Was it clear in your various conversations with Mr. Closson that at some point in time the prosecution was going to become public and he would have to testify in public proceedings?" Grimes responded,

"That's correct, yes." However, Grimes did not elaborate or point to any conversation with Closson which would have expressly limited the scope of the agreement. Based on the evidence of the record, and the fact that the superior court did not find an express term limiting the scope of the agreement, we conclude that there was none.

9. Closson argues that we should interpret an ambiguous immunity agreement in favor of the defendant. In other words, we should consider the agreement from the subjective view of the defendant. In general, however, contract law gives effect to the "reasonable expectations of the parties," not the subjective understanding of one party. *Mitford v. de Lasala*, 666 P.2d 1000, 1005 (Alaska 1983). Since we hold that a reasonable person would not have inferred that the promise of confidentiality was limited to the investigative phase of the case, we need not address this argument.

10. This testimony occurred in the following colloquy between Closson's attorney and Branchflower:

Butler (questioning Branchflower): "Now, you also recall that a promise was made to Mr. Closson that what he said would not be made public, don't you?"
Branchflower: "What he said when?"
Butler: "The assistance he was giving you. That his assistance, assisting the state, would not be made public?"

True, Closson did agree at the search warrant hearing that he would testify "in the future at any other court hearings." We find it significant, however, that Closson only agreed to testify after Branchflower assured him that the search warrant hearing was a closed proceeding. Moreover, the common understanding of grand jury proceedings is that they are closed to the public. Based on the evidence in the record, we conclude that a reasonable person in Closson's position would expect that his name would not be disclosed to the public, at least until it was absolutely necessary that he testify in a public trial.[11]

Thus, the superior court erred when it found that the promise of confidentiality contained in the immunity agreement was limited to the investigative phase of the case. Accordingly, when the state disclosed Closson's name to the public in the information filed on November 11, it breached its promise of confidentiality to Closson.

3. The state anticipatorily breached the agreement by asking Closson to perform further investigation after it had disclosed his name.

■ Even accepting the state's interpretation that the promise of confidentiality

was limited to the investigation, the state's demand that Closson engage in further investigation after it had disclosed his name constituted an anticipatory breach of its agreement.[12] If the state's interpretation of the agreement was accurate, Closson's obligation to wear a wire would have terminated upon the state's disclosure of his name. However, by virtue of the state's demand to Closson, the investigation was still continuing.

The state argues that because it had arrested all the principals in the primary crime, Closson should have known that the investigation was over. However, it appeared that the investigation was still ongoing. While Closson knew that Peters was collateral to the primary crime, since Peters only became involved through Closson's own behavior, Closson had no way of knowing whether some confederates of the principals might still be at large. In fact, Closson knew that the police had not finished the investigation—they still had loose ends to tie up.

More importantly, Closson knew that the police had disregarded his safety. When the police disclosed his name, he became known as a police informer. Indeed, the

Branchflower: "I don't recall making that statement. I may have. I don't recall it."
Butler: "But if you did make it, would you turn around and violate that agreement?"
Branchflower: "It's likely that I—I can't imagine making that—that unqualified sort of statement, because I knew as a prosecutor that informants—the identity of informants, especially informants who are so central to the prosecution, that their identity eventually becomes known, either through the discovery process or as a witness. And I expected him to testify on behalf of the State. I knew that his name would have to appear at the foot of the indictment. I knew that his statement would be discoverable to any defendants that were to be charged in the future. So I doubt that I ever told him that his cooperation with the police would remain a secret from everyone for all time."
Butler: "If the police made that promise to him, would you be willing to back that promise?"
Branchflower: "I'm not sure that I can answer that."

11. In *State v. Kuchenreuther*, 218 N.W.2d 621 (Iowa 1974), Kuchenreuther and the prosecu-

tion entered into an immunity agreement which stated "[t]he County Attorney agrees ... to keep all information received as confidential as is possible and will divulge the source of the information only if necessary to prosecute other persons other than Darwin Ray Kuchenreuther and will then require Darwin Ray Kuchenreuther's testimony only after subpoenaed into court of law." *Id.* at 622–23. Here, where Closson was given assurances of confidentiality and was never told of a requirement to testify in public, we believe it would be reasonable for Closson to assume that the terms of his agreement, like Kuchenreuther's, called for public disclosure only when necessary.

12. "[A] definite and unconditional repudiation of the contract by a party thereto, communicated to the other, is a breach of the contract, creating an immediate right of action and other legal effects, even though it takes place long before the time prescribed for the promised performance...." *Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 89 n. 3 (Alaska 1974) (quoting Corbin on Contracts, § 959 (1951)).

superior court recognized that Closson's reasonable fear for his own safety excused his failure to cooperate in the investigation of Peters. The superior court erred, however, in failing to recognize that the state's demand for Closson's assistance was in itself an anticipatory breach of the immunity agreement.

This result is bolstered by our conclusion that the scope of the agreement was at best ambiguous. At the time he was asked to wear a wire and meet with Peters on November 14, Closson understood that his promise for anonymity was, if not permanent, at least to last for a reasonable time. He knew, however, that at that time his undercover activities on behalf of the police had been disclosed. While Closson generally had agreed to cooperate with the state, we refuse to interpret this agreement as completely open-ended. Closson had to obey all reasonable requests. Similarly, the state had an obligation to keep all requests within reason. By requiring Closson to perform a task after it disclosed his identity, however, the state communicated its repudiation of the original agreement to Closson. Thus, the state anticipatorily breached its immunity agreement with Closson, entitling him to the appropriate remedy as required by contract law and due process, as discussed below.

B. *The circumstances require that the State specifically perform its obligations under the immunity agreement with Closson.*

1. The remedy for a breach of an immunity agreement by the state is specific performance.

In *Surina v. Buckalew,* 629 P.2d 969 (Alaska 1981), we confronted the situation where a witness made a self-incriminating statement in reliance on the prosecution's promise of immunity. We stated that when the prosecution breaches an immunity agreement, the promisee is entitled to rescission, which "should have the effect of placing the individual in the same position he would have been in had he not engaged in the agreement." *Id.* at 975 n. 14. However, because of the inherent impossibility of rescinding an incriminating statement, we noted that "the alternative remedies of 'rescission' and 'specific performance' will collapse into one, in most cases." *Id.*

Where an accused relies on a promise of immunity to perform an action that benefits the state, this individual too will not be able to "rescind" his or her actions. Therefore, we believe that the remedy of specific performance is equally applicable to Closson's situation, whether viewed as a remedy for a breach or for an anticipatory breach.[13]

2. Fundamental fairness dictates that the state be held to strict compliance after it breached its promise to Closson.

While we have determined that the state breached its agreement, we still must determine whether that breach is material—whether it was critical enough to excuse further performance on Closson's part. *See Closson,* 784 P.2d at 665 (materiality involves issues of law subject to *de novo* review). However, as this is an immunity agreement, and not a contract, we must interpret it with regard to substantial fairness, not just the law of contracts. *See Closson,* 784 P.2d at 665.[14]

---

**13.** *See also People v. Fisher,* 657 P.2d 922, 925 (Colo.1983) ("no other remedy short of enforcement of the promise would secure fundamental fairness to the defendant").

**14.** In the plea bargaining arena, the United States Supreme Court has held that states should be held to strict compliance with their promises. In *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), the prosecutor promised that, in return for a guilty plea, he would not make a sentence recommendation. However, at sentencing, a different prosecutor represented the state and he recommended the maximum sentence. The judge imposed the maximum sentence, but stressed that he was compelled to do so by the facts and was not influenced by the prosecutor's recommendation. *Id.* at 259, 92 S.Ct. at 497.

The Supreme Court found such a breach to be a violation of fundamental fairness. The defendant had "'bargained' and negotiated" for this promise so "the prosecution is not in a good position to argue that its inadvertent breach of agreement is immaterial." *Id.* at 262, 92 S.Ct. at 498. "[W]hen a plea rests in any significant degree on a promise or agreement of the prose-

Branchflower testified that the state's public disclosure of Closson's involvement on November 11 was immaterial, because Closson's role inevitably would have been revealed one week later at the grand jury proceeding. Closson, on the other hand, argues that given the time and nature of the state's disclosure, it was a material breach because of the threat to his safety.

Many courts consider the defendant's detrimental reliance as the gravamen of whether it would be unfair to allow the prosecution to withdraw from a plea agreement. *See* Annotation, *Right of Prosecutor to Withdraw From Plea Bargain Prior to Entry of Plea,* 16 A.L.R.4th 1089, 1094–1100 (1982). Here, Closson cooperated with the state and took risks on behalf of the state, which he would not have otherwise done but for the agreement. Moreover, Closson's cooperation conferred a large benefit on the state. To the extent that detrimental reliance is determinant, fundamental fairness dictates that the state should be required to specifically perform its part of the bargain.

Other factors enter into the fundamental fairness equation as well. Closson was initially a cooperative informant and he complied with all reasonable requests. From the start of their relationship, the state knew of Closson's concern with publicity and safety. The police promised him protection and anonymity, and Branchflower knew that Closson was at least reluctant, if not unwilling, to testify at an open hearing. By disclosing Closson's involvement unnecessarily, the state disregarded Closson's concerns and its own promises. More troubling is the state's disregard for Closson's safety. Fundamental fairness mandates that we consider this unnecessary exposure of Closson's identity. Finally, we must consider Closson's youth and lack of education, and the state's experi-

ence and knowledge. Here, the prosecution generally treated Closson fairly and initially did not press its bargaining advantage. Nevertheless, after the state revealed Closson's identity and Closson refused to wear the wire with Peters, the more experienced state should have better controlled the situation. Instead of negotiating with Closson to determine his concerns, the state simply threatened Closson with prosecution if he did not comply with their demand.

On the other side of the scale, although we note that Closson initially stole the gun and he lied at the search warrant hearing, these were both excused by the state. Unquestionably, Closson erred by going into hiding at the time the state made its objectionable demands and by not communicating his concerns. At the time, however, eighteen-year-old Closson had no legal counsel to whom he could turn for advice. In sum, we hold that fundamental fairness concerns are substantially in Closson's favor.

A similar situation arose in *State v. Johnson,* 23 Wash.App. 490, 596 P.2d 308 (1979). In *Johnson,* the defendant was an eighteen-year-old charged with second degree theft. In exchange for a lesser charge on that crime and immunity on another, Johnson agreed to cooperate with the authorities. At one point, however, Johnson had begun to distrust the deputy sheriff with whom he was dealing, and asked to see an attorney before cooperating further. The prosecutor considered this a breach of Johnson's agreement and filed charges.

The Washington Court of Appeals reversed Johnson's conviction. It noted that Johnson had initially cooperated, and only had ceased cooperating when the state behaved unreasonably by denying him access

cutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Id.*

We recognize that not all of the judicial concerns of plea bargaining are implicated when the prosecution grants immunity in exchange for cooperation without requiring the accused to plea to a lesser charge. However, we have previously applied the principles of *Santobello*

to prosecutorial breaches outside the plea bargaining arena. *Surina,* 629 P.2d at 978. We believe that the interests of fairness and the integrity of the criminal justice system require the application of those principles here as well. *See United States v. Carter,* 454 F.2d 426, 427–428 (4th Cir.1972); *People v. Fisher,* 657 P.2d 922, 927 (Colo.1983); *State v. Kuchenreuther,* 218 N.W.2d 621, 623–24 (Iowa 1974).

to an attorney. Moreover, the state suffered no prejudice from Johnson's technical breach, and in fact, the "state had reaped part of the benefit of its bargain and was therefore bound to give the defendant a reasonable time under reasonable conditions to fulfill his part." *Id.* at 312. Because the state's action was unreasonable, Johnson was entitled to have his conviction vacated and the charge dismissed.[15]

Here, Closson cooperated fully with every reasonable request. As a result of Closson's assistance, the state was able to proceed in a very important case. Thus, given Closson's substantial performance of his part of the bargain, the indeterminate scope of the agreement, the fact that fundamental fairness weighs heavily in favor of Closson, and the state's breach of the agreement, we find it would be unfair for the state to renege on its part of the bargain. As one court has explained, "it would be grave error to permit the prosecution to repudiate its promises in a situation in which it would not be fair and equitable to allow the State to do so." *Kisamore v. State,* 286 Md. 654, 409 A.2d 719, 721 (1980)

(quoting *State v. Brockman,* 277 Md. 687, 357 A.2d 376, 383 (1976)).

In sum, we conclude that the state breached its promise of confidentiality. Moreover, after disclosure of Closson's identity, the state made an unreasonable demand for further investigative participation by Closson pursuant to the immunity agreement. This constituted an anticipatory breach of that agreement. Closson has substantially complied with his obligations under the immunity agreement; therefore, we hold that the state must specifically perform its obligation.

REVERSED and REMANDED to the court of appeals with directions to remand to the superior court to VACATE Closson's conviction for second degree theft.

---

**15.** *See also State v. Kuchenreuther,* 218 N.W.2d 621 (Iowa 1974). There the defendant received a grant of immunity in exchange for promises to cooperate, to make restitution, and to plead guilty to a charge of disturbing the peace. The defendant kept his part of the bargain, except that no charge of disturbing the peace was ever entered against him. Instead, the state charged him with larceny. *Id.* at 623. The court reversed his conviction on the larceny charge, holding that "the bargain made was breached by the State. Under existing circumstances such is nothing less than an intolerable violation of our time-honored fair play norm...." *Id.* at 624.